[Cite as *State v. Hall*, 2017-Ohio-879.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


STATE OF OHIO,                                  :

    Plaintiff-Appellee,                         :

                                     :

  - vs -

                                       :

CHASTITY J. HALL,                              :

    Defendant-Appellant.                     :

CASE NO. CA2015-11-022

O P I N I O N
3/13/2017


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 15CR11727


Martin P. Votel, Preble County Prosecuting Attorney, 101 East Main Street, Eaton, Ohio 45320, for plaintiff-appellee

H. Steven Hobbs, 119 North Commerce Street, P.O. Box 489, Lewisburg, Ohio 45338, for defendant-appellant


    **M. POWELL, J.**

    {¶ 1} Defendant-appellant, Chastity Hall, appeals her convictions in the Preble County Court of Common Pleas for child endangering and involuntary manslaughter. For the reasons discussed below, we affirm in part and reverse in part.

    {¶ 2} This case involves the tragic deaths of Hall's children – Malea, age ten, and her brother Malachi, age nine – in a house fire. The facts are generally undisputed. On the

afternoon of Friday, February 20, 2015, Hall, Malea, and Malachi went to visit Hall's parents. Hall was planning on going out later that evening and had earlier arranged for her sister to babysit Malea, but she needed a sitter for Malachi. The purpose of this visit included finding a sitter for Malachi.

{¶ 3} Hall asked if her sixteen-year-old son could babysit Malachi.[1] Hall's parents said no. Hall became enraged and started yelling. Police responded to the home. Hall left with Malea and Malachi.

{¶ 4} Hall and the children returned to their home, a HUD rental located on U.S. 35, between West Alexandria and Eaton, Ohio. Hall's sister did not babysit Malea that night. Instead, Hall waited for the children to fall asleep. Around 11:20 p.m., Hall left her home and her children to go meet her friend Charlotte Emrick for drinks at the Veterans of Foreign Wars (VFW) post in Eaton.

{¶ 5} Around midnight, Hall and Emrick left the VFW and travelled to the Eaton Fraternal Order of Eagles bar (Eagles). After a short time at Eagles, Emrick left and went home. Hall remained at Eagles, texting with a man she wanted to meet.

{¶ 6} The man did not show and Hall went home between 1:00 a.m. and 1:30 a.m. Hall told investigators that while at home she reapplied her makeup and checked on her children. Malachi was sleeping in his bedroom and Malea was sleeping on the living room couch. Shortly before 2:00 a.m., Hall left her home again and went to the "230 Club," a bar in Eaton. She arrived at 2:05 a.m.

{¶ 7} Also around 2:00 a.m., Emrick received a knock on her door. Her visitor was Arcadio Escobar, Hall's "on-again/off-again" boyfriend. The evidence showed that Escobar and Hall's relationship was dysfunctional and violent. Hall claimed that Escobar had

---

1. Hall's older son lived with his grandparents, who adopted him as a baby.

previously attempted to start a grease fire in her home, assaulted her, and destroyed her property. Most recently, in December 2014, Escobar broke an exterior window and a table inside Hall's home. The same month, Hall reported Escobar to the police for stealing keys to her home.

{¶ 8} Emrick told Hall that Escobar was intoxicated and upset, was asking about Hall and her children and was angry that he and Hall were not "working things out." He kept saying that he was "sorry for this." He referenced the broken window incident. After about ten minutes Escobar left.

{¶ 9} Emrick texted Hall about the encounter at 2:13 a.m. She relayed that Escobar was intoxicated and that he was asking about Hall and Hall's children. Emrick and Hall exchanged a few text messages about the incident and then spoke on the phone.

{¶ 10} Hall then left the 230 Club and went to an "after-party" at the home of Chad and Amber Michael, arriving at around 2:30 a.m. Hall stayed at the Michaels' home until between 3:30 a.m. and 4:00 a.m. and then left with Ryan Walker, who she met at the party. Hall was intoxicated and had lost her car keys. Therefore, Walker drove them to his home where they had sex and fell asleep.

{¶ 11} At around 3:30 a.m. (approximately the same time Hall was leaving the party with Walker) an ODOT employee driving a snow plow was driving down Hall's driveway to get a better look at her home, which was on fire. At that time, the driver observed 30 to 40 foot flames going through the roof of the structure.

{¶ 12} The fire department arrived at the burning home at 3:50 a.m. The fire chief described the scene as a "fully-involved working structure fire." The roof collapsed into the structure. It took fire crews about 45 minutes to get the fire under control.

{¶ 13} Hall left Walker's house early that morning and eventually got a ride home from Emrick. She arrived at the fire scene around 7 a.m. Hall collapsed and told first responders

that her children were in the home. The fire department then contacted the state fire marshal to take over the investigation. Hall was uncooperative with police when they asked her where she had been.

{¶ 14} A few days later, police and fire investigators questioned Hall. Hall told the investigators that the home had numerous electrical issues, including an outlet in Malachi's room that would "throw sparks" when plugged in, a room that would "sizzle and pop" when the light switched was flipped on, and the appliances would regularly trip circuit breakers.

{¶ 15} Hall told investigators that she had smoke alarms in the residence. HUD inspection records confirmed that a HUD inspector had recently checked the home's smoke alarms and replaced a battery in one alarm.

{¶ 16} Hall discussed her suspicions concerning the possibility that Escobar started the fire. Police also suspected Escobar. They discovered that at 2:37 a.m. on the morning of the fire – about 25 minutes after he was at Emrick's house – Escobar crashed the vehicle he was driving while traveling west on U.S. 35.[2] During police questioning about his whereabouts that night, Escobar repeatedly lied to investigators. Ultimately, Escobar admitted that he walked up to Hall's home and opened the door around 15 minutes before the vehicle accident. He denied starting the fire. Police tested Escobar's clothing but could find no evidence that would support an arson charge. The state ultimately convicted Escobar of burglary based on his admission that he opened the door to Hall's home.

{¶ 17} There was also evidence that Malachi was setting fires in the home. About 40 days before the fire, Malachi set a coat and blanket on fire in his bedroom. Hall called the fire department and the fire chief came out to investigate and talked with Malachi. The fire chief observed the burned coat and blanket, which Hall had thrown outside. Inside the home,

---

2. Escobar lived in Richmond, Indiana and was headed in that direction.

the fire chief observed a six to twelve-inch burn mark where the coat and blanket had been. He also observed numerous older burn marks on Malachi's bed. The chief recommended that Malachi participate in a free counseling program for youthful firestarters. Hall declined to enroll Malachi in this program.

{¶ 18} The investigation into the cause and origin of the fire was jointly conducted by the state fire marshal's office and FEC, a fire/explosion consulting firm hired by the home owner's insurance company. A state fire marshal found the remains of Malea and Malachi in the basement of the home, however, both were found in approximately the same area of the home where they had been sleeping on the first floor, which collapsed into the basement during the fire. Accordingly, some evidence would indicate that the children died in their sleep. The remains were taken to a coroner and autopsied. The coroner testified that both children died as the result of smoke inhalation.

{¶ 19} Ultimately, neither the fire marshal's office nor the consulting firm determined a cause of the fire. Investigators could find no evidence of accelerant use to support an arson theory. Nor could the investigators determine if an electrical issue or faulty appliance may have started the fire. The fire investigators did conclude that the fire originated inside the structure in Hall's first floor southwest bedroom.

{¶ 20} Hall's defense case consisted only of the testimony of a fire expert. Hall's expert also was unable to determine the cause of the fire. Hall's expert agreed that the fire started in the southwest corner of the home. However, the expert opined that the fire started in the home's basement and not in Hall's first floor bedroom.

{¶ 21} A grand jury indicted Hall with two counts of endangering children in violation of R.C. 2919.22(A). The state charged these offenses as third-degree felonies, because the indictment alleged that the children suffered serious physical harm as a result of the violation, as provided in R.C. 2919.22(E)(2)(c). The grand jury also indicted Hall with two counts of

involuntary manslaughter in violation of R.C. 2903.04(A), felonies of the first degree and with two counts of involuntary manslaughter in violation of R.C. 2903.04(B), felonies of the third degree. One count of each of the various offenses related to each child.

{¶ 22} The case was tried to the court. The court issued a decision and entry on September 11, 2015, which detailed its findings and application of the facts to the criminal statutes. Ultimately, the court found Hall guilty of each of the third-degree felony endangering children offenses and first-degree felony involuntary manslaughter offenses. The court imposed an aggregate prison term of four years.

{¶ 23} Hall presents six assignments of error for our review.

{¶ 24} Assignment of Error No. 1:

{¶ 25} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN ALLOWING IN EVIDENCE OF LIKE AND SIMILAR ACTS.

{¶ 26} Hall argues that the court abused its discretion in admitting into evidence an exhibit depicting a Facebook conversation Hall had with a friend several months before the fire in which Hall admitted to leaving her children home alone. In the conversation, Hall states she does not need a babysitter to go out to the bar and socialize with friends and that she just waits until her children have fallen asleep. Hall added "LOL," or "laughing out loud" when discussing leaving her children in this manner. Hall argues that this evidence was improper character or conformity evidence. The state argues that the evidence was relevant to demonstrating that Hall acted recklessly, the culpable mental state for child endangering and, by extension, involuntary manslaughter predicated upon child endangering.

{¶ 27} "A trial court has broad discretion in the admission and exclusion of evidence." *State v. Martin*, 12th Dist. Butler No. CA2007-01-022, 2007-Ohio-7073, ¶ 9, citing *State v. Finnerty*, 45 Ohio St.3d 104, 109 (1989). Unless this court determines that the lower court abused its discretion and Hall was materially prejudiced, we will not disturb the decision of

the trial court. *Id.* An abuse of discretion occurs where the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8.

{¶ 28} Evid.R. 404(B) provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 29} Similarly, R.C. 2945.59 provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 30} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 15. The Ohio Supreme Court in *Williams* outlined a three-part test for courts to apply when considering the admissibility of other acts evidence. *Id.* at ¶ 19-20.

{¶ 31} First, the court should "consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.* at ¶ 20, citing Evid.R. 401. Second, the court should determine if "evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the

other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)." *Id.* Third, the court should "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

{¶ 32} Pursuant to R.C. 2901.22(C):

> a person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 33} This case presented no issues as to whether Hall's actions were the result of accident or mistake, as the evidence was overwhelming that she intentionally left her children unattended and asleep at home after some deliberation when she failed to obtain babysitters for them. Likewise, this is not a case where Hall's plan, scheme, motive or identity as the perpetrator was material. Nonetheless, we conclude that the Facebook conversation was marginally probative of recklessness, i.e., it was relevant toward demonstrating that Hall generally possessed an attitude of heedless indifference toward the care and safety of her children. However, inherent in this evidence is the risk that the prejudicial effect of tending to show that Hall was a "bad mother" outweighed its marginal probative value. We consider this assignment of error in the context of a bench trial in which we may generally presume that a judge, sitting as fact-finder, only considers relevant, material, and competent evidence in determining guilt. *State v. Flores*, 12th Dist. Warren No. CA2014-03-037, 2014-Ohio-5751, ¶ 29. There is nothing in the record, or in the decision and entry of the trial court, which indicates the Facebook conversation influenced the verdict.

{¶ 34} Accordingly, we conclude that the admission of the Facebook conversation was

not prejudicial error and that the trial court did not abuse its discretion in admitting this evidence. This assignment of error is meritless and is therefore overruled.

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT DENIED THE APPELLANT DUE PROCESS BY FAILING TO ADDRESS THE STATE'S FAILURE TO PRESERVE POTENTIALLY EXCULPATORY EVIDENCE.

{¶ 37} Hall argues that the state failed to preserve the fire scene for review by her expert, thus violating her due process rights. The evidence in this regard showed that the state fire marshal arrived the morning of the fire and located the remains of the children. The marshal obtained several debris samples from the fire scene and sent them to a laboratory. He took photographs.

{¶ 38} The next day, Charles Strader, the FEC lead investigator, arrived on scene to conduct the cause and origin investigation on behalf of the insurance company. Strader and/or other FEC employees took hundreds of photographs of the scene. Because the majority of the home and its contents collapsed into the basement, Strader physically divided the basement into six sections, which were marked with tape. He and other FEC employees then went through each section and placed all of the debris in that section onto a tarp. As the investigators loaded the tarp they inspected the debris for potential clues to the fire. Investigators then lifted the tarp out of the basement, placed it on the ground and sifted through the debris a second time. Strader also took samples from various parts of the home, which were sent to a laboratory.

{¶ 39} Once the investigators had searched the debris, it was then placed back in the home in its original section. Later, Strader secured various potentially relevant items from the debris field, including appliances, wiring, and samples from the house. These were taken to FEC's warehouse and stored. Both the fire marshal and FEC issued written reports.

{¶ 40} About a month after the state charged Hall, but before the grand jury indicted her, it appears that the state released the fire scene to the property owner. The owner then had what was left of the property destroyed and removed from the scene.

{¶ 41} Although Hall's expert witness was not able to walk the fire scene, he was able to visit FEC's warehouse and review the preserved debris evidence, including appliances and electronic components. He testified that it took him four to five hours to review all the evidence collected by FEC. Hall's expert also reviewed the written reports of the other fire experts and the hundreds of photographs taken during the investigation.

{¶ 42} The test for whether the state has infringed on a defendant's due process rights by losing or destroying evidence is whether the evidence was materially exculpatory or just "potentially useful." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 73. If the evidence was materially exculpatory, then the government has violated a defendant's due process rights in failing to preserve it. *Id.* at ¶ 74.

{¶ 43} Evidence is material when it has an "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (Alteration in original.) *Id.* Evidence is "potentially useful" when "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at ¶ 76, quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333 (1988). If the evidence is only potentially useful, then the defendant must show bad faith on part of the state in their failure to preserve the evidence. *Id.*

{¶ 44} Hall concedes that the remains of the fire scene that were destroyed were only potentially useful to her expert. Hall's expert testified that having the opportunity to view the fire scene prior to its destruction "may" have proved helpful in determining a cause of the fire. Accordingly, Hall must demonstrate some bad faith on part of the state. However, Hall

concedes that "here there is no evidence of bad faith." Accordingly, Hall cannot prevail on her due process claim. This assignment of error is meritless and is therefore overruled.

{¶ 45} Assignment of Error No. 3:

{¶ 46} THE TRIAL COURT ERRED IN APPLYING THE INCORRECT MENTAL STATE AS AN ELEMENT OF CHILD ENDANGERING.

{¶ 47} Hall contends that the trial court erred because its initial decision and entry finding her guilty failed to find that she acted recklessly, the culpable mental state for child endangering. Hall further claims that the error was not remedied when the trial court issued a supplemental decision and entry, at the state's request, indicating that it found Hall acted recklessly.

{¶ 48} Hall did not object and is therefore limited to a review for plain error. Crim.R. 52(B). We notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 49} There is no error here, plain or otherwise. Crim.R. 25(C) permits a "general finding" of guilt in cases that are tried to the bench. "Specific findings as to every element of the offense are not required under the rule." *State v. Arnold*, 8th Dist. Cuyahoga No. 103626, 2016-Ohio-7047, ¶ 22, citing *State v. Rode*, 11th Dist. Portage No.2010-P-0015, 2011-Ohio-2455, ¶ 31; *see also State v. Walker*, 26 Ohio App.3d 29, 36 (8th Dist.1985). Accordingly, the court did not err in failing to specify that Hall acted recklessly in its decision and entry. Other than the finding of guilt, the remainder of the courts comments "were mere surplusage without legal significance." *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 26. This assignment of error is meritless and is therefore overruled.

{¶ 50} Assignment of Error No. 4:

{¶ 51} THE TRIAL COURT ERRED IN REVIEWING A PORTION OF THE STATE'S

CLOSING ARGUMENT AFTER THE TRIAL WAS COMPLETED.

{¶ 52} Hall argues that the court erred when it asked the state to provide copies of Microsoft Powerpoint slides that the state used during its closing arguments. The state provided the slides as the trial court had requested, and subsequently notified Hall's attorney. Hall argues that this occurrence violated her due process rights because she has the right to be present at all important stages of the trial and because the court placed "undue emphasis" on the state's closing argument.

{¶ 53} The state concedes that it was improper to deliver the slides to the court without first notifying Hall, but that the error was harmless because the slides only contained factual summaries of admitted evidence and the trial court announced it had already reached its decision by the time it requested the slides.

{¶ 54} Hall cites no relevant authority in support of this assignment of error.[3] However, we understand Hall's argument to be that she was deprived of her procedural due process rights because the state provided the slides to the court without her knowledge and opportunity to object. Then, the court placed emphasis on the slides, further compounding the due process violation.

{¶ 55} "'The right to procedural due process is found in the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution.' At a minimum, due process requires notice and the opportunity to be heard. 'A hearing before judgment, with full opportunity to present all evidence and arguments which the party deems important, is * * * vital under the guaranty of due process of law.'" (Citations omitted.) *State v. Koller*, 12th Dist. Warren No. CA2013-07-069, 2014-Ohio-450, ¶ 25.

{¶ 56} We agree that the best practice under these circumstances would have been

---

3. Hall claims that the court's action violated R.C. 2315.01 but does not explain how. We find no error.

for the court to have included Hall's counsel in its request for a copy of the slides. However, even if we were to find this was error, we would conclude the error harmless.

{¶ 57} R.C. 2945.03 provides: "[t]he judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue." This code provision grants the trial court in criminal trials with discretion to control its proceedings and to conduct the trial in a manner necessary to arrive to the "expeditious and effective ascertainment of the truth." Here, on the record the trial court stated that it had requested the slides, which contained facts admitted at trial, in order to verify some of its own notes on the timing of events on the night leading into and the morning of the fire. We have reviewed the slides and agree that they are factual in nature as opposed to argumentative. Moreover, the trial court announced that it had already reached its decision, in writing, before requesting the slides.

{¶ 58} Accordingly, while the best practice would have been to permit Hall an opportunity to object, we perceive no error or prejudice, and thus no violation of Hall's due process rights. This assignment of error is meritless and is therefore overruled.

{¶ 59} Assignment of Error No. 5:

{¶ 60} THE TRIAL COURT ERRED IN NOT MERGING THE OFFENSES OF INVOLUNTARY MANSLAUGHTER AND ENDANGERING CHILDREN.

{¶ 61} Hall argues that the court erred by failing to merge the child endangering counts with the involuntary manslaughter counts. Hall concedes she is limited to a review for plain error because she did not object. The state concedes that plain error occurred because a single act supported the child endangering and involuntary manslaughter counts with respect to each child, i.e., Hall's act of leaving her children.

{¶ 62} When a failure to merge allied offenses is obvious, it rises to the level of plain

error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 31. This is true whether sentences are imposed consecutively or concurrently. *Id.* at ¶ 31.

{¶ 63} Pursuant to R.C. 2941.25, Ohio's multiple count statute, the imposition of multiple punishments for the same criminal conduct is prohibited. *State v. Brown*, 186 Ohio App.3d 437, 2010-Ohio-324, ¶ 7 (12th Dist.). Specifically, R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 64} As R.C. 2941.25(A)'s mandate is a protection against multiple sentences, a defendant is not convicted for purposes of this statute until a sentence is imposed. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 18. In order to determine which offenses are of dissimilar import that cannot be merged, the Ohio Supreme Court set forth the test to employ in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995. When conducting the analysis, if any of the following is true, a defendant may be convicted and sentenced for multiple offenses as the offenses cannot merge: (1) the offenses are of dissimilar import with separate, identifiable harm, (2) the offenses were separately committed, or (3) a separate animus or motivation was used to commit the offenses. *Ruff* at ¶ 25. Two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23.

{¶ 65} In this instance, it is obvious that the child endangering and involuntary manslaughter charges, respective to each child, are allied offenses. Each child endangering

count was the predicate offense of each involuntary manslaughter count. Hall's singular act of leaving her children home alone was the sole criminal act that supported the state charging her with both crimes. The harm that resulted, the death of her children, was the same for both charges.

{¶ 66} Accordingly, there is no evidence that the offenses were of dissimilar import, had a separate, identifiable harm, that they were separately committed, or that there was a separate animus or motivation to commit the offenses. Accordingly, Hall's multiple sentences for child endangering and involuntary manslaughter violate R.C. 2941.25(A). This assignment of error is therefore sustained. The sentences are vacated and the case is remanded to the trial court for resentencing. Upon remand, the state can elect which allied offense to pursue for each child, which the trial court must accept and then merge for resentencing.

{¶ 67} Assignment of Error No. 6:

{¶ 68} THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 69} Hall argues that her convictions for child endangering and involuntary manslaughter were against the manifest weight of the evidence. Specifically, Hall challenges the state's proof on causation, as well as her ability to foresee that her act of leaving her children home alone would cause them to die in a house fire. She argues that the state failed to prove what caused the fire and it was not foreseeable that they would die in a fire possibly set by Escobar.

{¶ 70} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. In making this determination, a reviewing court looks at the entire record, weighs the

evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. "An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Couch*, 12th Dist. Butler No. CA2016-03-062, 2016-Ohio-8452, ¶ 8.

INVOLUNTARY MANSLAUGHTER

{¶ 71} Hall was convicted of involuntary manslaughter, which provides that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). The term "proximate result" in the involuntary manslaughter statute involves two concepts: causation and foreseeability. With respect to causation, we have held that "[g]enerally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *State v. Feltner*, 12th Dist. Butler No. CA2008-01-009, 2008-Ohio-5212, ¶ 13.

{¶ 72} While "but for" causation is used in the vast majority of cases, there are circumstances where that analysis is inapplicable because, as a matter of law, there can be more than one proximate cause of an injury. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981); *Taylor v. Webster*, 12 Ohio St.2d 53, 56 (1967), *see also State v. Dunham*, 5th Dist. Richland No. 13CA26, 2014-Ohio-1042, ¶ 48.[4] In other words, a defendant can still be held

---

4. The cited cases from the Ohio Supreme Court are civil. However, the Revised Code does not define "proximate result," as used in the involuntary manslaughter statute. Nor does the criminal code define "proximate cause." It is well-settled law that the definition of cause or "proximate cause" in criminal matters is taken from civil negligence law. *See State v. Emerson*, 2d Dist. Darke Nos. 2015-CA-24 and 2016-CA-1, 2016-

criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury. Accordingly, a "but for" analysis is inapplicable in these rare cases. Lafave & Scott, *Criminal Law*, Section 35, 249 (1972).

{¶ 73} Where the defendant's conduct was only one of multiple causes that led to the legal injury, the test for causation is whether (1) the defendant's conduct was a "substantial factor" in bringing about the harm, and (2) there is no other rule of law that relieves the defendant of liability. *State v. Filchock*, 166 Ohio App.3d 611, 2006-Ohio-2242, ¶ 77 (11th Dist.); *State v. Flanek*, 8th Dist. Cuyahoga No. 63308, 1993 WL 335601, *6 (Sept. 2, 1993); *State v. Emerson*, 2d Dist. Darke Nos. 2015-CA-24 and 2016-CA-1, 2016-Ohio-8509, ¶ 24; *see also* Lafave & Scott, Section 35, at 250.

{¶ 74} Clearly the fire was the most substantial factor in causing the death of the children. The question is whether Hall's decision to leave her children home alone that night was another substantial factor in causing their deaths. After thoroughly reviewing the record, we conclude that the manifest weight of the evidence supports such a conclusion and the trial court did not lose its way in finding that Hall's actions were a cause-in-fact of the death of her children.

{¶ 75} In this case, there was some evidence that the fire began either in or beneath Hall's bedroom and that it took some time to develop. The smoke alarms in the home were recently checked by HUD inspectors and were functional. As an adult, Hall would be better prepared to know what to do in response to the smoke alarms sounding. Children are simply not as intellectually or physically equipped as adults to deal with emergencies. Thus, Hall may have discovered the fire before it was too late and saved her children.

{¶ 76} Additionally, through the texts and phone calls with Emrick, Hall was aware that

---

Ohio-8509, ¶ 24; *Dunham*, 2014-Ohio-1042 at ¶ 49; *State v. Cruse*, 1st Dist. Hamilton No. C-811031, 1982 WL 8765, *2 (Dec. 15, 1982).

her ex-boyfriend – who had previously attempted to start a fire in her home and had recently caused property damage at the home – was intoxicated and asking about Hall and the children at 2:00 a.m. Hall was five minutes away from her home at around 2:13 a.m. when she began to receive these texts. Had she gone home to check on the welfare of her children, she may have been in time to save them as the fire developed. Accordingly, we find that the greater weight of the evidence supported the conclusion that Hall's actions were a substantial factor and a cause in fact of her children's deaths.

{¶ 77} Our next inquiry is whether any other rule of law relieves Hall of criminal liability. Hall argues that Escobar likely caused the fire, and thus, he, not she, should bear the responsibility for the children's deaths. However, an intervening force, if foreseeable, does not negate legal proximate cause. *See State v. Johnson*, 56 Ohio St.2d 35 (1978). Next, we address foreseeability as the second concept involved in the term "proximate result" as used in R.C. 2903.04.

{¶ 78} With respect to foreseeability, this court has held "'when the result varied from the [harm] intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.'" *Feltner*, 2008-Ohio-5212 at ¶ 13, quoting *State v. Lovelace*, 137 Ohio App.3d 206, 215, 216 (1999). Under R.C. 2903.04, criminal responsibility for causing the death of another only exists where the resulting death was "direct, normal, and reasonably inevitable, when viewed in light of ordinary experience." *State v. Hall*, 12th Dist. Warren No. CA86-06-037, 1987 WL 13704, *3 (June 29, 1987).

{¶ 79} Stated otherwise, a defendant will be held responsible for "those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct." *State v. Losey*, 23 Ohio App.3d 93, 95 (10th Dist.1985). On the other hand, a defendant cannot be found guilty of involuntary manslaughter when "no

reasonable person could expect [death] to follow from his conduct." *Id.*

{¶ 80} In *Losey,* an elderly woman collapsed and died after the defendant burglarized her home. *Id.* at 94. The defendant had no direct interaction with the woman, but she heard him as he burgled her home. The Tenth District Court of Appeals affirmed the defendant's conviction for involuntary manslaughter, finding that the woman's death was the proximate result of hearing the defendant in her home. *Id.* at 96. In commenting on *Losey*, this court noted that "fear or anguish is the natural, logical and foreseeable result which [the defendant] could have or should have recognized as being within the scope of his felonious entry * * *." *Hall*, 1987 WL 13704 at *4.

{¶ 81} By contrast, in *Hall*, the defendant and his accomplice burglarized several houses and then stole a car. *Id.* at *1. Later that day, the defendant was driving the stolen car with the accomplice as a passenger. The defendant crashed the car, killing the accomplice. The defendant was charged with burglary and involuntary manslaughter for the death of the accomplice. *Id.* This court reversed the defendant's involuntary manslaughter conviction, finding that the automobile accident, hours after and miles away from the site of the burglaries was not a foreseeable result of the predicate offenses, i.e., the burglaries and car theft. *Id.* at *4.

{¶ 82} For the following reasons, we conclude that the manifest weight of the evidence supports the conclusion that the death of Hall's children was a natural, logical and foreseeable result which Hall could or should have recognized as being within the scope of her decision to leave her children home alone for an entire night.

{¶ 83} This court concludes that it is foreseeable to a parent that if they leave young children home alone for many hours an emergency situation may arise that a child would not know how to react to and that serious injury or even death can result. This is not a situation, like *Hall*, where the result is so far removed and disconnected from the predicate crime.

Although a fire may not have specifically been anticipated, the risk that children may be confronted with some emergency situation increases in proportion with the time during which they are unattended.

{¶ 84} However, in this case, there were indications that should have led Hall to be concerned about the risk of fire. Malachi was starting fires in his bedroom. Malachi's behavior was so concerning that Hall contacted the fire department. The fire chief who investigated recommended that Malachi get free counseling but Hall declined. Thus, Hall was aware that Malachi had a propensity to start fires and a fire professional believed he needed counseling. Accordingly, Hall had reason to foresee that Malachi could start a fire at the home while she was not home.

{¶ 85} Hall was also aware that the home had significant electrical issues, including electrical outlets that would "throw sparks." Finally, Escobar was in the area, angry, intoxicated and inquiring about Hall and her children. Hall, both at trial and on appeal, has gone to great lengths to point to Escobar as the likely cause for the fire. If Escobar did, in fact set the fire, this only bolsters the conclusion that Hall could have foreseen the fact that her children's safety was at risk. Hall was aware that Escobar had committed property crimes against her home, including attempting to start a grease fire inside the home. Only two months before the fire, he broke a window and destroyed a table inside the home. Accordingly, we find that the manifest weight of the evidence supports the conclusion that the death of Hall's children was a foreseeable result of her decision to leave her children home alone and that she was properly convicted of two counts of involuntary manslaughter.

CHILD ENDANGERING

{¶ 86} The state convicted Hall of felony child endangering, which prohibits parents or persons having custody or control of children from creating a "substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(A).

Endangering children pursuant to R.C. 2919.22(A) enhances from a misdemeanor to a third-degree felony "[i]f the violation * * * results in serious physical harm to the child involved * * *." R.C. 2919.22(E)(2)(c). In contrast to involuntary manslaughter, the serious physical harm element for felony endangering children does not require that serious physical harm be the "proximate result" of the violation, but only the result of the violation, as a matter of fact. Thus, the serious physical harm element of felony endangering children requires a less direct causal connection than that required for the death element of involuntary manslaughter.

{¶ 87} We conclude that the greater weight of the evidence supports the conclusion that Hall violated a duty of care by leaving her children home alone for many hours. Her absence from the home and her failure to ensure that another appropriate person was available to care for the children created a substantial risk to their health and safety. Moreover, our analysis of Hall's convictions for involuntary manslaughter is also dispositive on the causal link between the substantial risk to the children created by Hall's failure to observe her parental duty of care and protection, and the resulting serious physical harm. Accordingly, we find that the manifest weight of the evidence supports Hall's convictions for third-degree felony child endangering. This assignment of error is meritless and is therefore overruled.

{¶ 88} Judgment affirmed in part and reversed in part. This matter is remanded to the trial court for resentencing consistent with this court's resolution of Hall's fifth assignment of error.

HENDRICKSON, P.J. and PIPER, J., concur.