[Cite as *State v. Skoog*, 2022-Ohio-267.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. Earle E. Wise, Jr., P.J.<br>Hon. William B. Hoffman, J.<br>Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellee | |
| -vs- | Case No. 2021 CA 0020 |
| JORDAN SKOOG | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS:    Appeal from the Richland County Court of
                             Common Pleas, Case No. 2020 CR 0089

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      January 31, 2022

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

GARY BISHOP                           WILLIAM T. CRAMER
Prosecuting Attorney                  470 Olde Worthington Road
Richland County, Ohio                 Suite #200
38 South Park Street, Second Floor    Westerville, Ohio 43082
Mansfield, Ohio 44902

*Hoffman, J.*

{¶1}   Defendant-appellant Jordan J. Skoog appeals his convictions and sentence entered by the Richland County Court of Common Pleas, on one count of involuntary manslaughter with a firearm specification, one count of reckless homicide with a firearm specification, and one count of using weapons while intoxicated, following a jury trial. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2}   On February 11, 2020, the Richland County Grand Jury indicted Appellant on one count of involuntary manslaughter, in violation of R.C. 2903.04(A), a felony of the first degree, with an attendant firearm specification; one count of involuntary manslaughter, in violation of R.C. 2903.04(B), a felony of the third degree, with an attendant firearm specification; one count of reckless homicide, in violation of R.C. 2903.041(A), a felony of the third degree, with an attendant firearm specification; and one count of using weapons while intoxicated, in violation of R.C. 2923.15(A), a misdemeanor of the first degree.  The charges arose from the shooting death of Austin Smiley on March 20, 2019.  Appellant executed a written waiver of presence at his arraignment and entered a plea of not guilty to the charges.

{¶3}   Appellant filed a motion to suppress on August 25, 2020.  The trial court conducted a hearing on the motion on January 19, 2021.  Via Judgment Entry filed January 27, 2021, the trial court granted Appellant's motion, ordering the statements made by Appellant to Trooper Davenport on the evening of the incident be suppressed.

{¶4}   On February 10, 2021, Appellant filed a motion to strike/dismiss counts one and two of the Indictment, arguing the legislature never intended reckless homicide be a predicate offense for involuntary manslaughter.  At the hearing on the motion, the state

conceded reckless homicide could not be a predicate offense for involuntary manslaughter, and advised the trial court it did not object to the dismissal of count one. The trial court dismissed count one of the Indictment, but denied Appellant's motion as to count two.

{¶5} The matter proceeded to jury trial on February 19, 2021.

{¶6} Tyler Hamilton testified, in March, 2019, he and his then-girlfriend, Brenna Lifer, lived at 1665 Frontier Trail, Mansfield, Richland County, Ohio. Hamilton was a foreman for Mid-Ohio Pipeline. Appellant had been on Hamilton's crew for approximately a year to a year and a half although Hamilton had known Appellant from Mid-Ohio Pipeline for two or three years. On workdays, Appellant would arrive at Hamilton's home and they would drive to the designated job sites in Hamilton's company truck. Austin Smiley had been a member of Hamilton's crew for five or six months.

{¶7} A week prior to March 20, 2019, Appellant purchased a firearm and brought it to work with him. Hamilton described the firearm as "a very small handgun. Fit in the palm of your hand. A little pistol." Trial Tr., Vol. III at 104. Appellant showed Hamilton the gun, Hamilton looked at it then told Appellant to put the gun in the glovebox of the truck. Hamilton locked the glovebox. Hamilton recalled Appellant brought the gun to work two or three times, and each time Hamilton had Appellant lock it in the glovebox of the truck. Hamilton knew Appellant had ammunition for the gun, but did not know if the gun was loaded.

{¶8} During the workday on March 20, 2019, Appellant and Smiley were talking about their trucks, and Smiley agreed to sell a suspension leveling kit to Appellant. The men decided to meet at Hamilton's house after work as Appellant's truck was there. After

work, Hamilton and Appellant stopped at an ATM machine in order for Appellant to withdraw money for the leveling kit. Hamilton knew Appellant had his gun with him that day. While Hamilton and Appellant waited for Smiley to arrive at Hamilton's house, they hung out in the garage and drank beer. Smiley arrived approximately 20 to 30 minutes later. The three men consumed approximately four beers each. After Smiley arrived, Appellant brought out his gun and "was messing around with it," and "dropped [it] once on the ground." *Id.* at 115. Hamilton recalled the gun "would get put away on and off, but then it would come back out throughout the night." *Id.* Hamilton added, Appellant owned the gun, brought it to his [Hamilton's] house, and had the most possession and control over it throughout the evening.

{¶9} Around 6:15 p.m., Lifer joined the men in the garage and they proceeded to the Backroom, a nearby bar, to get something to eat. The group ordered dinner, beers, and shots of Crown Apple. Appellant did not order food because his wife had dinner waiting for him when he arrived home. Lifer did not drink that evening. They returned to Hamilton's house sometime after 8:00 p.m., and continued to drink. Hamilton indicated Appellant had his gun out a couple of times, "sliding back the slide on it, messing with it . . . playing with it." *Id.* at 121. Hamilton described what he meant by "playing with it": "It was like he was doing - - call it, per se, magic trick. Like, he would slide it back. You would think it's loaded, me and [Smiley] would think it's loaded. He would pull the trigger and it wouldn't go off. It would just click." *Id.* Hamilton observed Appellant do this "magic trick" four to six times.

{¶10} At approximately 9:00 p.m., Lifer entered the garage and told the three men they needed to come inside. Hamilton invited Appellant and Smiley to spend the night.

Smiley planned to telephone his father for a ride home. Appellant intended to drive himself home. Hamilton did not think either Smiley or Appellant was in a condition to drive. Hamilton, Appellant, and Smiley eventually entered the house. They stood in the kitchen, eating 100% proof moonshine cherries and drinking beer. Appellant and Smiley continued to play with the gun, passing it back and forth, for 45 minutes to an hour. Hamilton saw bullets in the magazine and stated the gun appeared to be loaded. At one point, Smiley pointed the gun at Appellant and pulled the trigger. Lifer heard what was going on, called Hamilton into the bedroom, and told him to put an end to it. Lifer then left the house and went to Hamilton's parents' home. Smiley finally telephoned his father.

{¶11} Hamilton left the kitchen to use the restroom. He noticed the gun was on the kitchen counter and the magazine was in the clip. Before Hamilton made it to the restroom, he heard a single shot. He turned around and saw Smiley on the ground, in a pool of blood. Hamilton knew Smiley was dead. Hamilton yelled, "This ain't no fucking joke now, is it?" *Id.* at 138. Appellant and Hamilton both began to panic. Hamilton put his dog in a crate in the bedroom. Appellant called his wife. Hamilton heard Appellant tell his wife "something happened, somebody's dead." *Id.* at 139.

{¶12} Hamilton exited the house through the front door and began making phone calls. He attempted to call Lifer and his father. He eventually spoke with his mother and told her something had happened and he needed someone to come to his house. Lifer and Hamilton's father arrived at the house shortly thereafter. Appellant came outside and walked to his truck. He began tossing his wallet, keys, and belt onto the truck bed cover. Lifer went into the house then called 9-1-1. When the police arrived, Hamilton was handcuffed, placed in the back of a cruiser, and transported to the sheriff's department

where he was processed and questioned. Hamilton did not know what became of Appellant.

{¶13} Brenna Lifer testified, in March, 2019, she was living with Hamilton in his Frontier Trail home. Lifer stated she and Hamilton had been dating three years and had lived together for two years. At the time, Lifer worked as a dental assistant. When she arrived home from work between 5:15 and 5:30 p.m. on March 20, 2019, Hamilton, Appellant, and Smiley were "hanging out" in the garage, talking, and drinking beer. *Id.* at 220. Lifer indicated she did not drink that evening because she was attending a business expo the next morning then driving to Indiana for a weekend course. Lifer, Hamilton, Appellant, and Smiley went to the Backroom for dinner sometime between 6:30 and 7:00 p.m.

{¶14} Prior to leaving for dinner, Lifer saw Appellant "messing around" with a little black gun. *Id.* at 227. Lifer told Appellant to put the gun away. She stated she was uncomfortable and feared something bad could happen. Lifer recalled, Appellant "was taking the mag out, or magazine out. He was cocking it and fiddling with it, fiddling with little parts of it." *Id.* at 228. Shortly after Lifer told Appellant to put the gun away, it fell to the ground. Lifer testified, "It fell to the ground. It was dropped. And it landed pointing at [Smiley'] leg. And I said, You could have shot his leg off. Now, you need to put it away." *Id.* at 229.

{¶15} While at the Backroom, Hamilton, Appellant, and Smiley continued to drink, consuming beer and a few shots. Lifer indicated the three men took turns buying rounds of beer and shots of Crown Apple. Lifer was ready to go home after they finished eating, but Hamilton, Appellant, and Smiley wanted to stay for another round. Lifer had not

planned on staying up all night drinking and "was starting to get a little snippy." *Id.* at 234. She expressed her displeasure and told them they either needed to stay at the house or go home.

{¶16} When they returned to the house, Lifer went inside and Hamilton, Appellant, and Smiley returned to the garage. Lifer heard the men revving the four wheelers. She went to the garage and again told them they either needed to come inside or go home because she was tired and was going to bed. Hamilton, Appellant, and Smiley moved into the kitchen. Lifer could not sleep because "[t]hey were being obnoxiously loud." *Id.* at 238. She went into the kitchen and asked them to go to bed. She texted Hamilton, asking him "to shut it down." Lifer recalled "I had heard [Appellant] tell [Smiley] that, 'Dude, you just pointed that thing at my face. Don't do that.' [Smiley] says, 'I'm sorry, man. I wasn't paying attention.'" *Id.* at 241. At approximately 10:00 p.m., Lifer left the residence and went to Hamilton's parents' home to sleep.

{¶17} Darrin Hamilton, Hamilton's father, roused Lifer, who was half asleep, and told her Hamilton was trying to get in touch with her. Lifer stayed in bed until Dee Hamilton, Hamilton's mother, came into the room and told her Darrin was leaving to go to Hamilton's house. Lifer looked at her phone and saw several missed calls from Hamilton, starting at 10:32 p.m. After several tries, Lifer reached Hamilton by phone. Hamilton told her she needed to come back to the house immediately. Lifer told Hamilton she was not returning until everyone was gone. Hamilton responded, "There's a dead man in our kitchen," explaining Smiley had been shot in the head. *Id.* at 245-246.

{¶18} Lifer ran barefooted to Hamilton's house. Darrin Hamilton, who was already there, told her not to enter the house. Hamilton was yelling at his father he did not do it.

Appellant was telling everyone to go. Lifer recalled Appellant saying, "I'll take care of this. It wasn't any of you. You guys go. I got this." *Id.* at 248. Lifer described everyone as yelling and frantic. Lifer entered the house and found Smiley dead on the kitchen floor. She immediately called 9-1-1.

{¶19} Darrin Hamilton testified he had laid down in bed at approximately 10:30 p.m. on March 20, 2019, when his wife received a call from Hamilton telling her Darrin Hamilton needed to get down to his house because "something happened." *Id.* at 297. He put on clothes and immediately drove to Hamilton's house. Hamilton was standing by the road when his father arrived. Darrin Hamilton rolled down his window and Hamilton told him Smiley was dead. Hamilton explained Appellant and Smiley were messing with a gun and the gun went off. Darrin Hamilton pulled into the driveway and exited his vehicle. Darrin Hamilton asked Appellant where the gun was located, but Appellant responded he did not know. Darrin Hamilton recalled Appellant standing by his truck, pulling his wallet, keys, and other items out of his pockets, and saying, "It wasn't [Hamilton's] fault. It wasn't [Smiley's] fault." *Id.* at 299. Darrin Hamilton stated he tried to keep everyone calm and cool until the police arrived.

{¶20} Dr. Susan Brown, a forensic pathologist at the Montgomery County Coroner's Office, testified she performed the autopsy on Smiley's body on March 21, 2019. Law enforcement officers were in attendance during the autopsy and collected evidence. During the external examination, Dr. Brown found a gunshot wound to Smiley's head. The entrance wound was located slightly left of the midline of Smiley's forehead. Dr. Brown indicated the bullet traveled through Smiley's scalp into his frontal skull then through the left side of his brain before coming to rest in the occipital skull, the back of

the skull, where Dr. Brown recovered it. The internal examination revealed injuries to the skull and brain due to the gunshot wound. When asked the distance or approximate distance between the muzzle of the firearm and Smiley's skull, Dr. Brown replied, "It's a contact wound." Trial Tr., Vol. IV at 430. On redirect examination, Dr. Brown indicated the gun was against Smiley's head and the hat he was wearing when it was fired.

{¶21} Gary Kiener, who works for the Richland County Sheriff's Department as a road patrol deputy and also owns K&M Safety Consultants, testified he trained and educated Appellant for his concealed handgun license. Kiener stated his training is guided by state laws and the Ohio Attorney General's Concealed Carry Laws Manual. Kiener indicated the number one priority is the safe handling of a firearm. Participants are instructed to keep their fingers off the trigger until they are ready to shoot and to always keep their firearm pointed in a safe direction. During training, Kiener emphasizes "any time alcohol is involved, that guns should not be mixed together." Trial Tr., Vol, V at 714. Kiener noted Appellant completed the course and received his certificate on February 5, 2017.

{¶22} Richland County Sheriff's Deputy Ryan Radojcsics[1], who was a major crimes detective at the time of the incident, testified he was called into work at approximately 11 p.m. on March 20, 2019. When he arrived, he was informed there had been a shooting, the victim had been shot in the head, and the shooting was potentially accidental. Deputy Radio was assigned to interview Appellant. Deputy Radio described Appellant's demeanor as calm, "for the most part," but also nervous. He noted he could tell Appellant had been drinking and was intoxicated. After reading Appellant his Miranda

---

[1] Deputy Radojcsics goes by the name "Deputy Radio" due to the difficulty people have in pronouncing his name.

rights and ensuring he understood those rights, Deputy Radio proceeded with the interview.

**{¶23}** During the course of the interview, Appellant detailed the events of the day. Appellant acknowledged having a drinking problem and admitted he was drunk that evening. Deputy Radio stated Appellant "was very aware of what the State laws are about having possession of a firearm with any alcohol in your system at all." Trial Tr., Vol. VI at 765. Deputy Radio indicated when he asked Appellant questions "related to anything to do with the gun, anything to do with the gun going off, anything to do with Austin Smiley being shot and dead," Appellant "would immediately start not remembering." *Id.* at 771.

**{¶24}** Sometime during the interview, Deputy Radio took a short recess to speak with Detective Pat Smith, who was interviewing Hamilton. After his conversation with Detective Smith, Deputy Radio realized Appellant was most likely the shooter and began asking Appellant more direct questions. Deputy Radio asked Appellant why he shot Smiley. Appellant's response, which was in quotes in the deputy's notes, was "There's no reason. Honestly, it was a fucking accident." *Id.* at 774. Appellant told Deputy Radio he did not shoot Smiley on purpose. When asked again why he shot Smiley, Appellant responded, "I don't have a reason. I can't give you a reason." *Id.* at 775. This statement also appeared in quotes in Deputy Radio's notes. Appellant told Deputy Radio he did not remember the gun going off, but admitted the gun was in his hand immediately after Smiley was shot. During the interview, Appellant acknowledged, because of the safeties, it was not possible for the gun to go off if it was dropped. The video of Deputy Radio's interview with Appellant was played for the jury.

**{¶25}** Deputy Radio indicated Appellant's gun had a trigger rate of 5 pounds, 11 ounces, meaning 5 pounds, 11 ounces of force is required to fire the gun. Appellant's gun was loaded with Hornady brand .380 caliber hollow point bullets. The particular bullets are "critical defense ammunition." *Id.* at 782.

**{¶26}** Appellant testified on his own behalf. Appellant recalled the events of March 20, 2019. After work, he and Hamilton stopped at a gas station. Appellant explained he was buying a leveling kit from Smiley and needed to get money from an ATM. Appellant purchased two tallboys, 24- or 25- ounce cans of beer, from the gas station. After drinking the beers, Appellant and Hamilton drove to Hamilton's house, arriving between 5:30 and 6:00 p.m. Appellant and Hamilton hung out in the garage and drank beer while they waited for Smiley to arrive. Appellant stated he was in possession of his Ruger LCP2 .380 firearm at the time. Appellant had purchased the firearm in early March, 2019. Prior to going to the Backroom, Appellant had consumed five or six beers. At the Backroom, Appellant, Hamilton, and Smiley each drank four or five beers and two or three shots of Crown Apple.

**{¶27}** Upon their return to Hamilton's house from the Backroom, the group hung out in the garage and continued to drink. Appellant admitted he took the gun out and "against my better judgment at one point, point[ed] it towards myself and I made a joke." *Id.* at 846. Appellant acknowledged he knew "it was probably against the law" to be in possession of a firearm while consuming alcohol. *Id.* at 847. Once inside the house, Appellant pulled his cell phone and gun out of his pocket and placed the items on the kitchen counter. Appellant testified Smiley handled the gun "quite a bit" throughout the

evening. At one point, Appellant showed Smiley how to conduct a functions check on the weapon.

{¶28} Appellant described the shooting of Smiley as follows:

And [Smiley] went to hand it back to me muzzle first, and I said, whoa, whoa, watch the barrel. And he went to turn the barrel as he handed it to me, and he let go before I had a grip. And I remember fumbling for it, and all of a sudden, it fell to my left. I turned around, picked it up off the ground, and I stood up.

And I just remember being confused. And [Hamilton] was yelling something at me from across the room, and I couldn't hear him. And then my hearing came back, and he said something along the lines of, "What the fuck? This isn't a joke," or "This is fucking serious," something along the lines of that.

And I turned and saw [Smiley], and I just – we both panicked. You know, I told [Hamilton] – I said, "Call 9-1-1 right now." I looked over at [Smiley]. I knew he was gone, at which point I deposited the magazine on the counter and rendered the firearm safe, because I had no idea how it just went off. I placed it on the counter. And I looked over at [Smiley], and I just didn't know. I knew he was gone. I knew there was nothing I could do.

*Id*. at 853-854.

**{¶29}** Appellant recalled, when Darrin Hamilton arrived, he asked Appellant where the gun was, but Appellant "wasn't thinking" and "had no idea." *Id.* at 856. Appellant stated Darrin Hamilton told him, "it's not [Hamilton's] fault, it's not [Smiley's] fault, it's my fault, just in reference to I was the one that brought the gun that night. *Id.* Appellant acknowledged he was at fault for having the gun and drinking, "[b]ut as to if I shot [Smiley], no, I did not." *Id.* at 857.

**{¶30}** On cross-examination, the prosecutor asked Appellant, using a toy gun, to demonstrate for the jury the moments immediately prior to Smiley being shot. Appellant testified, as Smiley was handing the gun back to him, Appellant told Smiley to "watch the muzzle." *Id.* at 863. Appellant continued:

> And he pointed it in towards that way, and I went to get it from him. And he lost his grip on it. At that point, I was grappling, and it went this way.
>
> I bent over and picked it up off the ground, and I picked it up and saw [Smiley] already on the ground, yes.
>
> *Id.*

**{¶31}** Appellant could not say when during the exchange Smiley was shot. Appellant also did not know whose finger was on the trigger when Smiley was shot. Appellant acknowledged he knew he was not to have a loaded firearm in his possession when he was drinking. Appellant also acknowledged the trigger on the gun had to be pulled in order for the gun to fire. Appellant did not take exception to the fact Smiley was shot point-blank in the forehead. Appellant described Smiley's death as an accident,

something "unintentional or unforeseen." *Id.* at 872. Appellant explained, "It never crossed my mind that a gun was going to go off that night." *Id.* at 873.

{¶32} After hearing all of the evidence and deliberating, the jury found Appellant guilty of involuntary manslaughter and the attendant firearm specification (Count 2), reckless homicide and the attendant firearm specification (Count 3), and using weapons while intoxicated (Count 4). The trial court merged Counts 3 and 4 with Count 2 then sentenced Appellant to a 36-month period of incarceration on Count 2. The trial court ordered the mandatory three year period term for the attendant firearm specification be served consecutive to the sentence imposed on Count 2, for an aggregate prison term of 6 years.

{¶33} It is from his convictions and sentence Appellant appeals, raising the following assignment of error:

APPELLANT'S CONVICTION FOR INVOLUNTARY MANSLAUGHTER IS AGAINST THE WEIGHT OF THE EVIDENCE ON THE ISSUE OF CAUSATION.

I

{¶34} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and

a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, *quoting State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶35}** Appellant was convicted of involuntary manslaughter, in violation of R.C. 2903.04(B), which provides:

(B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.

**{¶36}** Appellant was also convicted of the underlying misdemeanor, using a weapon while intoxicated, in violation of R.C. 2923.15(A), which provides:

(A) No person, while under the influence of alcohol or any drug of abuse, shall carry or use any firearm or dangerous ordnance.

**{¶37}** The term "proximate result" in the involuntary manslaughter statute involves two concepts: causation and foreseeability. *State v. Hall*, 12th Dist. Preble No. CA2015-

11-022, 2017-Ohio-879, ¶ 71, citing *State v. Feltner*, 12th Dist. Butler No. CA2008–01–009, 2008–Ohio–5212, ¶ 13. "Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *Id.*; See also *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58.

**{¶38}** Appellant asserts his conduct was not the "but for" cause of the shooting. Appellant explains he "repeatedly demonstrated his ability to safely perform a functions check that night," and "the problem did not arise until he allowed Smiley to try a functions test." Brief of Appellant at 15. Appellant adds "Smiley was unable to do so properly and they fumble the gun when Smiley tried to hand it back." *Id.*

**{¶39}** While "but for" causation is used in the vast majority of cases, there are circumstances where such an analysis is inapplicable because, as a matter of law, there can be more than one proximate cause of an injury. *Id.* at ¶ 72, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). "[W]here an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability." *Strother*, supra at 287. (Citation and internal quotations omitted). "In other words, a defendant can still be held criminally responsible where the defendant's conduct combined with other occurrences to jointly result in a legal injury." *Id.* "Accordingly, a 'but for' analysis is inapplicable in these rare cases." *Hall*, supra at ¶ 72, citing Lafave & Scott, *Criminal Law*, Section 35, 249 (1972).

{¶40} Assuming, arguendo, a "but for" analysis is not applicable to this matter, we find, as detailed in our Statement of the Case and Facts, supra, and summarized, infra, Appellant's original wrongful conduct, having a weapon while intoxicated, combined with the natural and continuous sequence of that act, Smiley handling the loaded weapon, was the proximate cause of Smiley's death, and Smiley's death would not have taken place without Appellant's original act.

{¶41} Appellant began drinking beer in Hamilton's truck on his way home from work. Appellant had his gun on his person at the time. Hamilton and Appellant consumed several beers while they waited for Smiley to arrive at Hamilton's house. Once Smiley arrived, the men continued to drink. According to Hamilton, Appellant brought out his gun and "was messing around with it," and "dropped [it] once on the ground." *Id.* at 115. Hamilton recalled the gun "would get put away on and off, but then it would come back out throughout the night." *Id.*

{¶42} Between 6:30 and 7:00 p.m., Appellant, Hamilton, Smiley, and Lifer went to the Backroom bar to eat. Prior to leaving for dinner, Lifer saw Appellant "messing around" with the gun. *Id.* at 227. Lifer told Appellant to put the gun away. Lifer recalled, Appellant "was taking the mag out, or magazine out. He was cocking it and fiddling with it, fiddling with little parts of it." *Id.* at 228. Shortly after Lifer told Appellant to put the gun away, it fell to the ground. Lifer testified, "It fell to the ground. It was dropped. And it landed pointing at [Smiley'] leg. And I said, 'You could have shot his leg off. Now, you need to put it away.'" *Id.* at 229.

{¶43} While at the Backroom, Appellant, Hamilton, and Smiley each drank several more beers and did at least three shots each of Crown Apple. They returned to Hamilton's

house sometime after 8:00 p.m., and continued to drink. Hamilton indicated Appellant had his gun out a couple of times, "sliding back the slide on it, messing with it . . . playing with it." *Id.* at 121. Hamilton described "playing with it" as a "magic trick." Appellant describe what he was doing as a "functions check." Hamilton observed Appellant do this "magic trick" four to six times.

{¶44} After 9:00 p.m., Hamilton, Appellant, and Smiley entered the house. They stood in the kitchen, eating 100% proof moonshine cherries and drinking beer. Appellant and Smiley continued to play with the gun, passing it back and forth, for 45 minutes to an hour. Hamilton saw bullets in the magazine and stated the gun appeared to be loaded. At one point, Smiley pointed the gun at Appellant and pulled the trigger. From the bedroom, Lifer heard Appellant tell Smiley, "Dude, you just pointed that thing at my face. Don't do that." *Id.* at 241. Lifer recalled Smiley says, "I'm sorry, man. I wasn't paying attention." *Id.* Hamilton left the kitchen and went to the restroom. He noticed the gun was on the kitchen counter and the magazine was in the clip. Before Hamilton made it to the restroom, he heard a single shot. He turned around and saw Smiley on the ground, in a pool of blood. The coroner testified Smiley died of a contact wound to the middle of his forehead. Appellant knew "it was probably against the law" to be in possession of a firearm while consuming alcohol. *Id.* at 847.

{¶45} We further find Smiley being shot and, ultimately, killed was a foreseeable consequence of Appellant's actions. A "defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of risk created by his conduct." *State v. Sabo*, 3d Dist. Union No. 14-09-33, 2010-Ohio-1261, ¶ 25, quoting *State v. Losey*, 23 Ohio App.3d 93, 95 (1985), (Internal

quotations omitted).  An ordinary prudent person could reasonably anticipate injury or death as likely to result under these circumstances, to wit: one individual consuming an excess amount of alcohol, handling a loaded firearm throughout the evening, and passing that weapon between himself and another individual who was also consuming an excess amount of alcohol.

{¶46}  Based upon the foregoing, we find Appellant's conviction was not against the manifest weight of the evidence.

{¶47}  Appellant's sole assignment of error is overruled.

{¶48}  The judgment of the Richland County Court of Common Pleas is affirmed.


By: Hoffman, J.
Wise, Earle, P.J.  and
Baldwin, J. concur