[Cite as *State v. Mitchell*, 2019-Ohio-5168.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                     CASE NO. 14-19-14

    v.

LATOYA BLANCHE MITCHELL,           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 2018-CR-0084

**Judgment Affirmed**

Date of Decision: December 16, 2019

APPEARANCES:

    *Alison Boggs* for Appellant

    *David W. Phillips* for Appellee

Case No. 14-19-14

**SHAW, J.**

{¶1} Defendant-appellant, LaToya Mitchell ("Mitchell"), brings this appeal from the January 29, 2019, judgment of the Union County Common Pleas Court sentencing her to 10 years and 10 months in prison after Mitchell was convicted by a jury of Involuntary Manslaughter in violation of R.C. 2903.04(A), a felony of the first degree, Trafficking in Cocaine in violation of R.C. 2925.03(A)(1), a felony of the fifth degree, and Trafficking Heroin in violation of R.C. 2925.03(A)(1), a felony of the fifth degree. On appeal, Mitchell argues that there was insufficient evidence presented to support her convictions, that her convictions were against the manifest weight of the evidence, that the trial court erred in providing a supplemental jury instruction in response to a juror's question, that the trial court erred by failing to *voir dire* a juror when the juror was "physically upset" during deliberations, that the trial court erred in denying Mitchell's request for new counsel on the morning of trial, and that the cumulative errors in this trial prejudiced her.

*Background*

{¶2} On April 12, 2018, Mitchell was indicted for Involuntary Manslaughter in violation of R.C. 2903.04(A), a first degree felony, Trafficking in Cocaine in violation of R.C. 2925.03(A)(1), a fifth degree felony, Trafficking in Heroin in violation of R.C. 2925.03(A)(1), a fifth degree felony, and Aggravated Trafficking in Drugs in violation of R.C. 2925.03(A)(1), a fourth degree felony. It was alleged

-2-

that Mitchell sold heroin and crack-cocaine on or about November 16, 2016, and that the drugs were ingested by Sydney Allmon, resulting in Sydney's death. The Aggravated Trafficking in Drugs charge alleged that Mitchell knowingly sold or offered to sell a "Schedule II" substance, specifically carfentanil. Mitchell pled not guilty to the charges.

{¶3} The matter proceeded to a jury trial on October 25-26, 2018. Before the jury was selected, the State "*nolled*" the Aggravated Trafficking in Drugs charge, indicating that "as it relates to Fentanyl or carfentanil which there was a trace of that * * * I don't think there's sufficient evidence to show that she knowingly sold that drug." (Oct. 25, 28, Tr. at 6). The State proceeded to trial on the remaining three charges.

{¶4} Testimony at trial revealed that Sydney Allmon struggled with addiction and met Brandon Redd in a rehabilitation center in Florida. Sydney and Brandon began dating, but were removed from a sober living facility in Florida after they both relapsed. The couple returned to Ohio approximately three days before Sydney's death.

{¶5} On November 15, 2016, the day before Sydney's death, between 12:00 p.m. and 1:15 p.m., Brandon was in contact with a drug dealer named "Chop" and he was separately in contact with Mitchell—Chop's sister. Brandon acquired drugs

from Chop at that time, not from Mitchell, then Brandon indicated that he and Sydney were out of money.

{¶6} In order to get money, Sydney contacted a gentleman's club called Siren's to work a shift there. Sydney's shift was scheduled to begin at 7:00 p.m. on November 15, 2016. Brandon dropped off Sydney at work and he indicated that she used heroin before her shift. Sydney arrived at Siren's shortly after 7:00 p.m. and went to work.

{¶7} During her shift, at 9:59 p.m., Brandon messaged Sydney and asked her how much money she had made. Sydney responded, "like 80 i think ill [sic] count in a sec." (State's Ex. 26). Brandon picked up Sydney from work around 2:30 a.m. on November 16, 2016. The two attempted to contact various drug dealers that they knew in order to acquire drugs. Sydney tried to call "YC Moore" to ask if she could stop by. Moore was one of her "main source[s] of supply," but no contact was made. (Oct. 25, 2018, Tr. at 178).

{¶8} At the time, Brandon was unable to make calls on his phone as his mother had shut off the calling feature in the previous hours; however, he could still send text messages and send messages through Facebook.

{¶9} At 2:38 a.m. Sydney and Brandon attempted to contact "Chop" on Sydney's phone. Although Chop had sold drugs to Brandon the prior afternoon, Brandon indicated that they were out of drugs. Using Sydney's phone, Brandon

identified himself to Chop and told Chop he was trying to acquire drugs. Chop responded to get ahold of him in the morning.

{¶10} When their initial efforts attempting to contact dealers were unsuccessful, Brandon contacted Mitchell and asked if it was too late to "come thru [sic]." Brandon knew Mitchell through Chop, and had seen her before when he was making drug transactions with Chop, but Brandon had never purchased drugs from Mitchell. Mitchell asked Brandon what he wanted, and Brandon responded $60 worth of "boy" and $40 worth of "hard." (Oct. 25, 2018, Tr. at 231). Testimony indicated that "boy" represented heroin and "hard" represented crack-cocaine. Brandon later changed his request for drugs from Mitchell to $60 of "boy" and $30 of "hard."

{¶11} Sydney and Brandon drove to Delaware, Ohio, where Mitchell lived. At 3:32 a.m., there was a 58 second call to Mitchell from Sydney's phone. Brandon indicated that he talked to Mitchell on the phone and she told him where to park. Brandon then met with Mitchell and purchased the drugs while Sydney waited in the car in a nearby parking lot.

{¶12} At 3:36 a.m., Brandon sent Mitchell a message from his own phone stating that he was "out back" at Mitchell's residence. At 3:41 a.m., Mitchell responded that she was coming but had to redo her work because Brandon changed the amounts. At 3:42 a.m. Brandon sent Sydney a message saying he was about to

head back to the vehicle, and Sydney responded, "hurry, i'm so sketched since we're the only car here." After Brandon returned to the car, Sydney and Brandon returned to Brandon's mother's house in Marysville where they used drugs.

{¶13} Shortly after 2 p.m. on November 16, 2016, Brandon called 9-1-1. He indicated that when he tried to wake up Sydney, she was cold and unresponsive. Emergency responders came to the scene and Sydney was pronounced dead at 2:46 p.m. An autopsy revealed, to a reasonable degree of medical and scientific certainty, that Sydney died of "Acute intoxication by the combined effects of cocaine and morphine (probably from heroin)."[1] (State's Ex. 48). A toxicologist indicated that Sydney had ingested the cocaine and heroin within hours of her death.

{¶14} Brandon gave law enforcement officers permission to search the area around Sydney's body. Among Sydney's things were a crack pipe, scissors, a "kit" with "q-tips," and a shoelace. (Oct. 25, 2018, Tr. at 165). An officer testified that a shoelace was regularly used to "tie off" a vein for injections. (*Id*. at 166). Inside Brandon's bookbag were "two small Zip lock baggies containing small amounts of a white powdery substance." (*Id*. at 186). The residue in the baggies was tested and one bag was found to contain heroin with trace amounts of carfentanil, while the other bag was found to contain Cocaine. (*Id*. at 216-217).

---

[1] Sydney "screened positive for Amphetamine, Benzodiazepines, Benzoylecgonine which is Cocaine Metabolite, Cannabinoids, Methamphetamine and Opiates." (Oct. 26, 2018, Tr. at 10). Nevertheless, the Union County Coroner testified that Sydney died from acute intoxication from the combined effects of cocaine and morphine. (*Id*. at 29).

{¶15} Brandon affirmatively identified Mitchell at trial as the individual who sold the heroin and crack-cocaine to him, which he shared with Sydney. Brandon testified that he had been convicted of Involuntary Manslaughter for sharing the drugs with Sydney that resulted in her death. He testified that he made a deal with the State for a favorable sentencing recommendation to testify against Mitchell.

{¶16} To corroborate Brandon's testimony regarding Mitchell as the source of the heroin and crack-cocaine, the State introduced text messages with Mitchell that were linked to a phone she was using to set up the drug transaction. A detective built a timeline through text messages, Facebook messages, and calls to track the activity of Sydney and Brandon over the last day of Sydney's life. Testimony was also introduced that based on cell tower tracking, the messages regarding the drug transaction were coming from the area of Mitchell's residence in Delaware. Ultimately the jury returned guilty verdicts for all three counts against Mitchell.

{¶17} On January 29, 2019, the matter proceeded to sentencing. Mitchell was ordered to serve 9 years in prison on the Involuntary Manslaughter conviction, 11 months in prison on the Trafficking in Cocaine conviction, and 11 months in prison on the Trafficking in Heroin conviction. All of the sentences were ordered to be served consecutively for an aggregate prison term of 10 years and 10 months. A judgment entry memorializing the sentence was filed that same day. It is from

this judgment that Mitchell appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The jury lost its way when reviewing the evidence, resulting in a verdict that is against the manifest weight of the evidence and the sufficiency of the evidence.**

**Assignment of Error No. 2**
**The trial court erred when it supplemented the jury instructions after the instructions had been approved by appellee and appellant's counsel and read to the jury and appellant was further prejudiced when her attorney failed to object to the supplemental instruction.**

**Assignment of Error No. 3**
**The trial court erred when it failed to conduct an inquiry with Juror #8 to determine if the juror was able to perform her duties after it was reported she was hysterical and physically upset when the jury went back to deliberate.**

**Assignment of Error No. 4**
**The trial court erred when it overruled appellant's motion for new counsel without first determining the status of the attorney/client relationship by inquiring of appellant the basis for the motion.**

**Assignment of Error No. 5**
**Appellant was denied a fair trial as a result of the cumulative errors that occurred throughout the trial.**

*First Assignment of Error*

{¶18} In Mitchell's first assignment of error, she argues that there was insufficient evidence presented to convict her of Involuntary Manslaughter and that her conviction was against the manifest weight of the evidence. Specifically she

argues that the State failed to prove the charge of Involuntary Manslaughter beyond a reasonable doubt. She argues that Brandon Redd's involvement in this matter was an intervening factor, breaking the chain of causation required to prove Involuntary Manslaughter.[2]

### *Standard of Review*

**{¶19}** Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶20}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the

---

[2] Mitchell does not make any arguments regarding her two trafficking convictions in her brief, thus we will not address them. Nevertheless, even if she did contest the trafficking convictions, they were supported by the evidence.

factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

{¶21} Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

{¶22} In this case, Mitchell was convicted of Involuntary Manslaughter in violation of R.C. 2903.04(A), which reads "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."[3]

{¶23} "The term 'proximate result' in the [I]nvoluntary [M]anslaughter statute involves two concepts: causation and foreseeability." *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 71, citing *State v. Feltner*, 12th Dist. Butler No. CA2008–01–009, 2008–Ohio–5212, ¶ 13. "Generally, for a

---

[3] The felony allegedly committed was Trafficking in Cocaine or Trafficking in Heroin in violation of R.C. 2925.03(A)(1), which reads, "No person shall knowingly * * * [s]ell or offer to sell a controlled substance or a controlled substance analog."

criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *Id*.; *see also State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58 (providing a thorough discussion of proximate result and causation). While "but for" causation is used in the vast majority of cases, there are circumstances where that analysis is inapplicable because, as a matter of law, there can be more than one proximate cause of an injury. *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 72, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981); *Taylor v. Webster*, 12 Ohio St.2d 53, 56 (1967), *see also State v. Dunham*, 5th Dist. Richland No. 13CA26, 2014–Ohio–1042, ¶ 48.

{¶24} "The second component of causation—the legal or "proximate" cause—refers to the foreseeability of the result." *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 53, citing Katz, Martin, & Macke, *Baldwin's Ohio Practice, Criminal Law*, Section 96:4 (3d Ed.2018). A " 'defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of risk created by his conduct.' " *State v. Sabo*, 3d Dist. Union No. 14-09-33, 2010-Ohio-1261, ¶ 25, quoting *State v. Losey*, 23 Ohio App.3d 93, 95 (10th Dist.1985). It is generally accepted that "[t]he possibility of overdose is a reasonably foreseeable consequence of the sale of heroin." *State v.*

*Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, ¶ 91; *Carpenter* at ¶56.

**{¶25}** In order to convict Mitchell of Involuntary Manslaughter at trial, the State presented the testimony of 11 witnesses. The testimony clearly established that Brandon and Sydney were in a relationship, that they struggled with addiction, and that they had recently returned to Ohio after being removed from a sober living facility due to relapsing. The testimony also established that in order to get money on November 15, 2016, Sydney worked a shift at Siren's gentleman's club, and that after her shift Brandon picked her up. At that time, after 2 a.m., Brandon contacted a dealer known as "Chop" in an attempt to acquire drugs, but "Chop" said to come by in the morning. Brandon and Sydney attempted to contact another dealer without success, then Brandon made contact with Mitchell and arranged to ultimately buy $60 in heroin and $30 of crack-cocaine.

**{¶26}** Brandon and Sydney went to Delaware and a call was made to Mitchell's phone from Sydney's phone lasting nearly a minute. Brandon went to Mitchell's residence and purchased the drugs from her as they had agreed via text messages. Brandon and Sydney used some of the drugs that night in Marysville, then Brandon went to sleep. When Brandon later attempted to wake Sydney, she was cold and unresponsive. She died of an overdose.

{¶27} On appeal, Mitchell argues that Brandon actually supplied the drugs that caused Sydney's death. Mitchell contends that Brandon had, in fact, already admitted his culpability in Sydney's death and that both Brandon and Mitchell could not be charged with Involuntary Manslaughter of Sydney, particularly here where Mitchell did not sell drugs directly to Sydney or ever meet with Sydney.

{¶28} Contrary to Mitchell's arguments, the jury was presented with essentially uncontroverted testimony that Mitchell sold crack-cocaine and heroin— with trace amounts of carfentanil—to Brandon. Even to the extent that Mitchell contested the issue of the sale, cell mapping data and cell phone records supported Brandon's direct testimony. Moreover, the jury was presented with information that a minute-long call was made from Sydney's phone to Mitchell's phone shortly before the transaction. Based on this, it would be reasonable for a jury to infer that Mitchell was aware of Sydney's presence with Brandon or that Mitchell had spoken with Sydney that evening. Thus while Mitchell argues that she had no direct connection to Sydney, the phone records show otherwise.

{¶29} Furthermore, there is no indication that Brandon did anything to alter the drugs that were purchased from Mitchell and then consumed by Sydney shortly thereafter. In fact, Brandon testified that by the time Sydney went to work at Siren's they were out of drugs. A reasonable jury could find based on the evidence

presented that Mitchell provided the drugs that caused Sydney's death, which were purchased with Sydney's money from her shift at Siren's.

{¶30} While Mitchell argues that both Brandon and Mitchell could not have been charged with Involuntary Manslaughter, case authority establishes that there may be more than one proximate cause for an Involuntary Manslaughter. *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 72, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). Importantly, however, Brandon's conviction is not before this Court, only Mitchell's, and the evidence supports that Mitchell supplied the drugs that proximately resulted in Sydney Allmon's death. Thus, but-for Mitchell trafficking in drugs the death would not have happened.

{¶31} When dealing with addicts and narcotics, particularly heroin and carfentanil, Ohio Courts have found that "overdose is a reasonably foreseeable consequence of the sale of heroin." *Carpenter*, *supra*, at ¶ 76. Notably, the State even presented some testimony to explain differing tolerance levels and that because Sydney had been sober for a period before this several-day binge she might have taken an amount that would get her high previously, but could have now killed her.

{¶32} Although Mitchell argues that Sydney could have acquired more drugs elsewhere, the jury was free to determine based on the evidence that the drugs she ingested were supplied by Mitchell, and the jury is in the best position to evaluate credibility. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶33} On the basis of the facts before us we find that the State presented sufficient evidence to convict Mitchell of Involuntary Manslaughter and that her conviction is not against the manifest weight of the evidence. Therefore, Mitchell's first assignment of error is overruled.

*Second Assignment of Error*

{¶34} In Mitchell's second assignment of error, she argues that the trial court erred by providing a supplemental jury instruction in response to a juror's question.

Standard of Review

{¶35} The issue raised in Mitchell's second assignment of error was not challenged before the trial court, therefore we review it for plain error. For this Court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial. *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, ¶ 30, citing *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, ¶ 11, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642; *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 13; Crim.R. 52(B). Moreover, "even when the minimum requirements have been met, a reviewing court should still be conservative in its application of plain-error review, reserving notice of plain error for situations involving more than merely theoretical prejudice to substantial rights." *Steele* at ¶ 30, citing *State v. Long,* 53 Ohio St.2d 91, 94 (1978). "Notice of plain error under Crim.R. 52(B) is

to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus.

Analysis

{¶36} After providing final instructions to the jury in this matter, the trial court asked if all twelve members of the panel were ready to proceed to deliberations. The trial court noted there were no negative responses, but then a juror had a question, and the following dialogue took place.

> **JUROR: I have a question.**
>
> **THE COURT: All right.**
>
> **JUROR: In terms of the law, because I'm a little fuzzy on the, um, Involuntary Manslaughter legislation involving illegal trafficking in drugs. Um, I'm assuming, under the State of Ohio – under Ohio Revised Code can more than one person be charged with Involuntary Manslaughter for the same death?**
>
> **THE COURT: Well, now you have the instructions of the Court in this particular case.**
>
> **JUROR: Yeah.**
>
> **THE COURT: You have a charge in this case.**
>
> **JUROR: Right.**
>
> **THE COURT: So, the Court expects you to carry out your duty in this case.**
>
> **Now, is there anything else? Hearing nothing. * * ***

Case No. 14-19-14

(Oct. 26, 2018, Tr. at 115-116). The trial court then sent the jury to deliberate, but the court remained on the record, and the following discussion occurred between the trial court, the prosecutor, and defense counsel.

**[PROSECUTOR]: All right * * * Your Honor, considering juror number ten's question, I think the appropriate answer would be yes even though that's not a question in terms of instructions but, I think, the jury should understand that more than one person can be charged.**

**THE COURT: Yes, well, I agree. I didn't want to answer the question directly without consulting with counsel before I did that.**

**[PROSECUTOR]: [Defense counsel].**

**THE COURT: So, I gave him a temporizing answer for the moment.**

**[PROSECUTOR]: I understand that, Your Honor.**

**THE COURT: But, if counsel are agreeable, we can send a supplemental written instruction to the jury that more than one person can be charged.**

**[PROSECUTOR]: The State would request that, Your Honor.**

**THE COURT: Any objection, [Defense Counsel]?**

**[DEFENSE COUNSEL]: I'm trying to think of one. No. I don't believe so, Your Honor.**

**THE COURT: All right, we will do that. I will formulate one and write it out and with counsel's permission and after you've approved it, I will send it to the jury. * * ***

**And we will do that immediately. Other than that, we're in recess.**

-17-

[Following the recess]

**THE COURT:  At the conclusion of the case before the jury retired or after the jury retired, excuse me, [the prosecutor] asked the Court to respond more fully to the question that was posed by juror number ten \* \* \* before the jury retired.**

**The Court has formulated the following answer and is submitting it to the jury, in my handwriting, on a piece of yellow tablet paper dated 10-26-18.**

**To answer more fully the question asked by juror number ten \* \* \*, yes, more than one person may be charged with a particular crime and [sic] that person or persons participated in the commission thereof.**

**And I have signed my name and wrote Judge underneath.  This has been reviewed with counsel for the prosecution, counsel for the defense, and I believe, they pose no objection.**

(*Id*. at 117-120).  Both the prosecutor and defense counsel indicated that they had no objections.

{¶37} On appeal, Mitchell claims that the trial court's supplemental instruction was plain error, and it was further error for her attorney not to object to preserve this issue for appeal.  She argues that the trial court's response was not part of an official "Ohio Jury Instruction" and that this prejudiced her.  Mitchell claims that the juror's question showed that deliberations essentially began in the

courtroom and that there was at least a question in that juror's mind regarding the potential of a conviction in this matter.[4]

{¶38} Mitchell's arguments, and the instruction itself, are largely irrelevant in this matter as the task before the jury was to determine whether Mitchell committed the offenses as alleged based on the evidence presented from the State. The jury was *not* tasked with determining whether Brandon committed Involuntary Manslaughter, or whether Brandon and Mitchell could both be convicted of Involuntary Manslaughter.

{¶39} In this matter, the jury had to assess the elements and find that Mitchell's Trafficking offense(s) proximately resulted in the death of Sydney Allmon. The trial court's instruction did nothing to change the verbal and written instructions that indicated the jurors had to find that the State proved each and every element of the offenses beyond a reasonable doubt. Furthermore, as stated previously, there can be more than one proximate cause of an injury or death, which would seem to allow for multiple prosecutions. *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 72, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). Thus the trial court's statement would not be inaccurate as Mitchell suggests.

---

[4] Mitchell cites no legal authority to support her contentions.

{¶40} For all of these reasons we do not find that there was any error here, let alone plain error that impacted the outcome of the trial. Therefore Mitchell's second assignment of error is overruled.

*Third Assignment of Error*

{¶41} In her third assignment of error, Mitchell argues that the trial court erred when it failed to conduct an inquiry with Juror #8 after the jury reported that Juror #8 was "physically upset."[5] Mitchell argues that the trial court abused its discretion by failing to replace the juror with an alternate.

Standard of Review

{¶42} Under Ohio law, "a trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.' " *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198 (11th Dist.1985). (Other citations omitted.) " '[S]ound discretion has long meant a discretion that is not exercised arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir.1970) citing *Langnes v. Green*, 282 U.S. 531, 51 S.Ct. 273 (1931).

---

[5] Mitchell's brief uses the word "hysterical," but that is not included in the note from the jury.

Case No. 14-19-14

Analysis

**{¶43}** Criminal Rule 24(G) and R.C. 2945.29 govern the removal and replacement of jurors during criminal trials. *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2016-Ohio-144, ¶ 18, citing *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794 ¶ 45. Revised Code 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" *See also State v. Jennings*, 8th Dist. Cuyahoga No. 104626, 2017-Ohio-8224, ¶ 11, *appeal not allowed*, 152 Ohio St.3d 1444, 2018-Ohio-1600.

**{¶44}** In this case, after the trial court dealt with the issue of the "supplemental instruction" discussed in the previous assignment of error, a recess was taken. Court reconvened with the trial court stating as follows.

> **THE COURT: Let the record show that the Court and counsel have convened in the *La[T]oya Mitchell* case. The jury had presented a question or request to the Court and the Court and counsel have reviewed that.**
>
> **It reads as follows: Juror number eight does not wish to continue. She is crying and physically upset.**
>
> **\* \* \* That is juror Amber C[.] The Court has formally made a response and submitted it to counsel for review.**
>
> **Miss C[.], you took an oath and assumed an obligation to do justice in this case. The Court and counsel expect you to honor your obligation and continue your deliberations.**

-21-

(Oct. 26, 2018, Tr. at 120-121).

{¶45} Both the State and defense counsel indicated that the trial court's response was satisfactory. The trial court also asked if either counsel had anything to add, and they did not.

{¶46} Shortly thereafter the jury returned guilty verdicts, and because of the note that came out from the jury, both the State and the defense requested that the jurors be polled as to their verdicts. The jurors were polled, and they indicated that they had, in fact, returned guilty verdicts.

{¶47} Mitchell argues on appeal that the trial court should have replaced the juror in question even though neither party requested it, and even though the juror did not indicate that she could not continue; rather, the note merely indicated that the juror did not "wish" to continue. The Supreme Court of Ohio has found that under perhaps more serious protestations from a juror, it was not error for the trial court to have a juror continue to deliberate, particularly where the juror was later polled as to the verdict. *See State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶¶ 43-44, citing *State v. Hessler*, 90 Ohio St.3d 108 (2000).

{¶48} Notably, at the point the note came out, the jurors had been out of the courtroom for just over 30 minutes. Under the facts presented in this case, and where the juror did not express a more significant concern as to why she could not continue deliberations, we cannot find that the trial court abused its discretion in

-22-

declining to replace the juror, particularly where there was no request from the defense. There were no further indications of difficulty presented from the jury and the juror was polled as to her verdicts. Therefore Mitchell's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶49} In Mitchell's fourth assignment of error, she argues that the trial court erred when it overruled her motion for new counsel that was made on the morning of trial.

Standard of Review

{¶50} We review a trial court's decision to decline to replace appointed counsel under an abuse of discretion standard. *State v. McNeill*, 83 Ohio St.3d 438, 452, 1998-Ohio-293.

Analysis

{¶51} On the morning of the scheduled trial, Mitchell informed her attorney that her family would possibly pay for a private attorney in this matter, and that she wanted to get new counsel. Defense counsel brought this issue to the trial court's attention, and the following discussion ensued.

> **[DEFENSE COUNSEL]: Secondarily, Your Honor, when I came into the courtroom just a few minutes ago with Miss Mitchell, she wrote down a question for me indicating, can I get another attorney or is it too late?**

We addressed that in Chambers. I guess I'd like the Court to hear what she has to say before the Court rules on that motion. She's indicated to me that family members have contacted an attorney in Urbana and have the money to pay him and she's decided she would like private counsel.

THE COURT: All right, well, I'll hear your motion.

[DEFENSE COUNSEL]: Go ahead.

[MS. MITCHELL]: I have been incarcerated for the past six months and the things that I wanted looked into my attorney could not look into for me. Um, I know that I'm going to be there for awhile [sic] fighting this case. I just – I'd like a better opportunity to fight, honestly. I haven't – I've never been to a trial before.

THE COURT: Are you telling the Court that, at some time in the past, [defense counsel] did not do something that you asked him to do or something that you believe he legally should have done?

MS. MITCHELL: Yes.

THE COURT: Why didn't you bring it up then?

MS. MITCHELL: I was told that the only way I could get rid of my attorney is in front of the Judge and this is the first time in the six months that I have been incarcerated that I've gotten in front of a judge.

THE COURT: Did you ever communicate this to [defense counsel]?

MS. MITCHELL: No.

THE COURT: Why not?

MS. MITCHELL: At the time, I didn't – I didn't have financial backing. I didn't have anyone to help me get an attorney.

THE COURT:  Well, you did not communicate to [defense counsel] at any time in the past that you were dissatisfied with his services though.  Is that correct?

MS. MITCHELL:  Um, there have been things that I've wrote down and I've asked him to look into but he has told me –

THE COURT:  Did you ever tell him at any time in the past that you were dissatisfied with his services?  Yes or no?

MS. MITCHELL:  No.

THE COURT:  All right, so this is the first time it's come up?

MS. MITCHELL:  I was told that I couldn't get any help until I came before a Judge.

THE COURT:  Did you tell [defense counsel]?  [Defense counsel] is your link between you and the Court.  Did you understand that?  That, if you tell [defense counsel] something, [he] comes to the Court.

MS. MITCHELL:  I did not understand.

THE COURT:  So, you've never communicated any problems that you alleged to have had with [defense counsel]?

MS. MITCHELL:  No, Your Honor.

THE COURT:  You've never asked him to step down.  You've never asked him to withdraw from the case so that you could get private counsel?

MS. MITCHELL:  I did not know that I could.

THE COURT:  Well –

MS. MITCHELL:  I thought he was Court appointed and I just had to keep him as an attorney.

**THE COURT:  Well, anything else you want to tell me?**

**MS. MITCHELL:  That is all.**

**THE COURT:  Well, the trial is scheduled for today.  The jury is assembled.  You have counsel.  Unless you can point to some specific problem that you are having with [defense counsel], the trial's going to go forward today.**

**So, we're not going to continue the case, again, so that you can possibly get some other attorney to get up to speed in the case and be prepared to proceed with trial.  That could take another six months to a year during which you will remain incarcerated.**

**MS. MITCHELL:  I understand**

**THE COURT:  Understood?**

**MS. MITCHELL:  Yes.**

**THE COURT:  All right, motion overruled.  Proceed.**

(Oct. 25, 2018, Tr. at 9-13).

{¶52} After reviewing the transcript, we cannot find that the trial court abused its discretion in this matter by denying Mitchell's request, which was made on the first day of trial.  Mitchell did not have a breakdown of communication with her attorney and there is no firm indication that she could actually obtain a private attorney other than some vague intimations that her family spoke with an attorney in Urbana.  *State v. Ortiz-Santiago*, 8th Dist. Cuyahoga No. 105441, 2017-Ohio-8878, ¶ 27 (record failed to demonstrate a breakdown in communication, so trial court's denial of motion for new counsel was not an abuse of discretion).  Further,

the jury and the witnesses had been assembled and Mitchell's appointed counsel was ready to proceed to trial. *See State v. Oliver*, 10th Dist. Franklin No. 17AP-195, 2018-Ohio-602, ¶ 12 (where new counsel requested on day of trial, timing weighed against him). The trial court had a right to balance Mitchell's request for new counsel with its inherent authority to control its own docket, while maintaining an awareness that the demand for counsel could be utilized as a way to delay the proceedings. *State v. Brown*, 7th Dist. Mahoning No. 16MA0161 2018-Ohio-253, ¶ 19. For all of these reasons, we cannot find that the trial court abused its discretion. Therefore, Mitchell's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶53} In Mitchell's fifth assignment of error, she argues that the cumulative impact of the trial court's errors denied her a fair trial.

Standard of Review

{¶54} "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). " 'To find cumulative error, a court must first find multiple errors committed at trial and

determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.' " *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Analysis

**{¶55}** Because we have found no errors in this matter, let alone cumulative errors, the doctrine of cumulative error does not apply here. *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. Therefore, Mitchell's fifth assignment of error is overruled.

*Conclusion*

**{¶56}** For the foregoing reasons Mitchell's assignments of error are overruled and the judgment of the Union County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**